IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SANDRA NELSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-12-1950 |
| | § | |
| CAROLYN W. COLVIN, COMMISSIONER | § | |
| OF THE SOCIAL SECURITY | § | |
| ADMINISTRATION,[1] | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Court[2] in this social security appeal is Defendant's Motion for Summary Judgment (Document No. 10) and Brief in Support (Document No. 11), and Plaintiff's Cross Motion for Summary Judgment (Document No. 13). After considering the cross motions for summary judgment, each sides' Response to the other's Motion for Summary Judgment (Document Nos. 15 & 18), the entire administrative record, the written decision of the Administrative Law Judge dated November 20, 2009, and the applicable law, the Court ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment is GRANTED, Plaintiff's Motion for Summary Judgment is DENIED, and the decision of the Commissioner is AFFIRMED.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she therefore should be substituted for Michael J. Astrue as the defendant in this case.

[2] On March 7, 2013, pursuant to the parties' consent, this case was transferred by the District Judge to the undersigned Magistrate Judge for all further proceedings. *See* Document No. 17.

## I.     Introduction

Plaintiff Sandra Nelson ("Nelson") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of a partially adverse final decision of the Commissioner of the Social Security Administration ("Commissioner") on her claim for disability insurance benefits. Nelson argues in this appeal that: (1) "Defendant failed to consider all of the evidence;" and (2) "Defendant failed to follow Movant's treating physician's opinion that Movant is disabled. " Plaintiff's Motion for Summary Judgment (Document No. 13) at 2. The Commissioner, in contrast, argues that there is substantial evidence in the record to support the ALJ's November 20, 2009, decision, that the decision comports with applicable law, and that the decision should be affirmed.

## II.     Procedural History

This case has a complicated procedural history. On July 7, 2000, Nelson applied for disability insurance benefits, claiming that she was unable to work since April 1, 2000, as a result of fibromyalgia, chronic fatigue, labyrinthitis (vertigo), depression, foggy head, pain, memory loss, pain in her feet, joints and back, nervous legs, and sleeping problems. (Tr. 117-119; 126). The Social Security Administration denied her application at the initial and reconsideration stages. After that, Nelson requested a hearing before an ALJ. The Social Security Administration granted her request and an ALJ, Bennett Engelman, held a hearing on September 9, 2002, in Vancouver, Washington, at which Nelson's claims were considered *de novo*. (Tr. 37-70; 436-439). On October 23, 2002, the ALJ issued his decision finding Nelson not disabled. (Tr. 12-26).

Nelson sought review of the ALJ's October 23, 2002, adverse decision with the Appeals

Council, but her request for review was denied.  (Tr. 5-6).  She then sought judicial review of the decision in the United States District Court for the Western District of Washington.  On April 2, 2004, the adverse decision was remanded by the District Court for further proceedings.  (Tr. 395A-399).   The Appeals Council, in turn, vacated the decision, and remanded the case to "an Administrative Law Judge for further proceedings consistent with the order of the court."  (Tr. 406-407).

On April 22, 2005, after holding another hearing, at which Nelson again testified, ALJ Thomas P. Tielens issued a partially favorable decision, finding Nelson disabled from November 11, 2004, but not before.  (Tr. 377-395).  Nelson again sought review of the unfavorable portion of the ALJ's decision with both the Appeals Council, which denied her request for review, and the United States District Court for the Western District of Washington, which granted her request and again remanded her application for further proceedings.  (Tr. 574-583).  The Appeals Council, in its corresponding order remanding the case to an Administrative Law Judge, wrote:

> The Appeals Council hereby vacates the final decision of the Commissioner of Social Security with regard to the period prior to November 11, 2004, and remands this case to an Administrative Law Judge for further proceedings consistent with the order of the court on the issue of disability prior to November 11, 2004.
>
> The Administrative Law Judge found that since November 11, 2004, the claimant had the residual functional capacity to perform a reduced range of sedentary work, was unable to perform her past relevant work, and that Rule 201.14, Table No. 1, Appendix 2 to Subpart P, Regulations No. 4, directed a conclusion that she was disabled.
>
> The U.S. District Court has remanded for further consideration of the period prior to November 11, 2004.  The Court held that further consideration was needed as to whether chronic fatigue was a severe impairment.  The Court also noted that the Administrative Law Judge did not make a specific finding as to what the claimant's residual functional capacity was for the period prior to November 11, 2004, and did not address opinion evidence from treating sources Joe Marion, M.D. (Exhibit 10F) and Vivian Blanco, M.D. (Exhibit 22F).

3

Upon remand the Administrative Law Judge will:

- Evaluate the diagnosed impairment of chronic fatigue syndrome and make a specific finding as to whether it constitutes a severe impairment.

- Give consideration to the treating source opinions pursuant to the provisions of 20 CFR 404.1527 and Social Security Rules 96-2p and 96-5p, and explain the weight given to such opinion evidence.  As appropriate, the Administrative Law Judge may request the treating sources to provide additional evidence and/or further clarification of the opinions and medical source statements about what the claimant could still do despite the impairments through November 10, 2004 (20 CFR 404.1512).  The Administrative Law Judge may enlist the aid and cooperation of the claimant's representative in developing evidence from the claimant's treating sources.

- Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and Social Security Ruling 96-8p).

- Obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Rulings 83-14 and/or 96-9p).  The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole.  The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566).  Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

In compliance with the above, the Administrative Law Judge will offer the claimant the opportunity for a hearing, take any further action needed to complete the administrative record and issue a new decision with regard to the period prior to November 11, 2004.

(Tr. 586-587).

On May 20, 2008, another hearing was held, this time in Houston, Texas, before ALJ Janis Estrada.  In a written decision dated July 25, 2008, ALJ Estrada determined that Nelson was not

disabled from April 1, 2000 (her alleged onset date) through November 10, 2004.  (Tr. 553-565).

The Appeals Council, upon Nelson's request for review, found fault with that decision and remanded

it to the ALJ as follows:

> Under the authority of 20 CFR 404.984, the Appeals Council assumes jurisdiction
> of this case and affirms the finding that the claimant was disabled beginning
> November 11, 2004, with the attainment of age 50.  The Appeals Council remands
> this case to an Administrative Law Judge for resolution of the following issue for the
> period prior to November 11, 2004:

> •   The hearing decision does not contain an adequate evaluation of the treating
>     source opinions in Exhibits 10F, 18E, and 22F.  Via report dated October 23,
>     2001 Joe Marion, M.D., that the claimant was incapable of even low stress
>     jobs.  Dr. Marion indicated that during a typical work day the claimant would
>     frequently experience pain or other symptoms severe enough to interfere with
>     attention and concentration needed to perform even simple tasks.  On July 1,
>     2003 Vivian Blanco, M.D., revealed that the claimant was unable to work due
>     to the severity of her symptoms.  The hearing decision contains no evaluation
>     about the weight afforded these opinions or their impact on the claimant's
>     maximum residual functional capacity.

> Upon remand the Administrative Law Judge will:

> •   Give further consideration to the claimant's maximum residual functional
>     capacity during the entire period at issue and provide rationale with specific
>     references to evidence of record in support of assessed limitations (Social
>     Security Ruling 96-8p).  In so doing, evaluate the treating source opinions
>     pursuant to the provisions of 20 CFR 404.1527 and Social Security Rulings
>     96-2p and 96-5p, and explain the weight given to such opinion evidence.  As
>     appropriate, the Administrative Law Judge may request the treating sources
>     to provide additional evidence and/or further clarification of the opinions and
>     medical source statement about what the claimant could still do despite the
>     impairments through November 11, 2004 (20 CFR 404.1512).    The
>     Administrative Law Judge may enlist the aid and cooperation of the
>     claimant's representative in developing evidence from the claimant's treating
>     sources.

> •   If warranted by the expanded record, obtain evidence from a vocational
>     expert to clarify the effect of the assessed limitations on the claimant's
>     occupational base (Social Security Ruling 83-14).  The hypothetical questions
>     should reflect the specific capacity/limitations established by the record as a
>     whole.  The Administrative Law Judge will ask the vocational expert to

identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566).  Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

In compliance with the above, the Administrative Law Judge will offer the claimant the opportunity for a hearing, address the evidence which was submitted to the Appeals Council, take any further action needed to complete the administrative record and issue a new decision on the issue of disability for the period prior to November 11, 2004.

(Tr. 618-619).  A supplemental hearing was then held before ALJ Estrada on July 10, 2009 (Tr. 624-644), after which the ALJ issued another written decision, dated November 20, 2009, again finding that Nelson was not disabled between April 1, 2000 and November 10, 2004.  (Tr. 537-549).  On May 19, 2012, after the Appeals Council found no basis for review of the ALJ's November 20, 2009, decision (Tr. 523-525), the November 20, 2009, decision became final.

Nelson filed a timely appeal of the ALJ's November 20, 2009 decision, seeking judicial review of that decision pursuant to 42 U.S.C. § 405(g).  The parties then filed cross motions for summary judgment (Document Nos. 10 & 13), which have been fully briefed and are ripe for ruling.  At issue in this appeal, is the determination that Nelson was not disabled between April 1, 2000, and November 10, 2004.

## III.    Standard for Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999).

Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing" when not supported by substantial evidence. 42 U.S.C.§ 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

7

IV.     **Burden of Proof**

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability.  *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).  The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied to work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen,* 782 F.2d 1284, 1286 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to decide disability status:

1.     If the claimant is presently working, a finding of "not disabled" must be made;

2.     If the claimant does not have a "severe impairment" or combination of impairments, he will not be found disabled;

3.     If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4.      If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5.      If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience and residual functional capacity, he will be found disabled.

*Anthony,* 954 F.2d at 293; *see also Leggett v. Chater,* 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan,* 925 F.2d 123, 125 (5th Cir. 1991). Under this framework, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel,* 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett,* 67 F.3d at 563.

Here, the ALJ, in the November 20, 2009 decision, found at step one that Nelson had not engaged in substantial gainful activity after April 1, 2000, her alleged onset date; found at step two that Nelson's fibromyalgia, chronic fatigue syndrome, obesity, thyroid disorder and depression were severe impairments; and found at step three that Nelson did not have an impairment or combination of impairments that met or medically equaled a listed impairment. The ALJ then, prior to consideration of steps four and five, determined that Nelson had, "with mild to moderate pain symptomology . . . the residual functional capacity to: lift and carry up to 20 pounds occasionally; lift and carry up to 10 pounds frequently; sit without limitation (with normal morning and afternoon 15-minute breaks and a lunch break) except she must have a sit/stand option throughout an 8-hour work day; and perform work that does not require working with the public and complex and varied work instructions. [She] is capable of performing simple repetitive work tasks on a sustained basis

9

without normal morning and afternoon 15-minute breaks and a lunch break." (Tr. 544). Applying

that residual functional capacity (RFC), the ALJ found, at step four, that Nelson could not perform

any of her past relevant work. At step five, using the previously determined RFC, and considering

Nelson's age, education, and work experience, and the testimony of a vocational expert, the ALJ

concluded that there were unskilled jobs in significant numbers in the national and regional economy

that Nelson could perform, such as office helper, mail clerk, and photocopier, and that she was,

consequently, not disabled.

In this appeal, Nelson argues that the ALJ erred in determining her RFC and in finding her

not disabled between April 1, 2000 and November 10, 2004. According to Nelson, the ALJ failed

to properly consider all the evidence in the record, and failed to properly consider and properly weigh

the opinions and statements of her treating physicians. Nelson points, in particular, to the findings

and opinions of Dr. Litman, who conducted a memory assessment interview, as well as the opinions

of two of her treating physicians, Drs. Marion and Blanco, that she is unable to perform even low

stress work.

In determining whether there is substantial evidence to support the ALJ's decision, including

his RFC determination, the court considers four factors: (1) the objective medical facts; (2) the

diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective

evidence of pain and disability as testified to by the plaintiff and corroborated by family and

neighbors; and (4) the plaintiff's educational background, work history and present age. *Wren,* 925

F.2d at 126.

V.     **Discussion**

A.     ***Objective Medical Evidence***

The objective medical evidence shows that Nelson has been diagnosed with, and treated for, fibromyalgia and chronic fatigue since the mid-to-late 1990's. (Tr. 193-195; 214).  She also has long-standing issues with depression. (Tr. 284-285).

With respect to the period of time at issue herein, April 1, 2000 through November 10, 2004, the record shows that Nelson was seen by Dr. Jeffrey Taylor from April 27, 1999 to December 4, 2000, for her complaints of fatigue, depression, stiffness, insomnia,  mental confusion, numbness, and pain, which he attributed to fibromyalgia and chronic fatigue syndrome, and for which he prescribed anti-depressants, Neurontin, Medizine, and pain medication.  (Tr. 200-216).[3]  In a "Medical Report" to the Division of Disability Determination Services dated December 4, 2000, Dr. Taylor noted that Nelson had good range of motion in all her joints except her left wrist, which was painful on flexion, her neurological findings were normal, her gait was normal, her fine and gross motor function was normal, and her sensory exam was normal.  (Tr. 201-202).  He further noted his treatment, which consisted of NSAI [non-steroidal anti-inflammatory] drugs, anti-depressants, Neurontin and pain pills, and his diagnosis of fibromyalgia.  (Tr. 201-202).

Nelson was also seen, in June and July of 2000, by L. Johansen, a podiatrist, for her "painful feet."  (Tr. 196-199).   Johansen diagnosed Nelson with plantar fasciitis, heel spur syndrome, metatarsalgia, and gastroc equinus, gave her a cortisone injection, and prescribed custom orthotics.

---

[3] During some of this same time period, Nelson's condition was closely followed by a nurse practitioner, Nancy L. Powers.  (Tr. 286-308).  While the nurse practitioner's notes are extensive, they do not contain much objective medical evidence, and instead are generally recitations of Nelson's subjective complaints.

11

(Tr. 196-199).

On December 6, 2000, at the request of the Division of Disability Determination Services, a Memory Assessment Interview of Nelson was conducted by Jack M. Litman, Ph.D.  (Tr. 225-231). In connection with that assessment, Nelson was interviewed for approximately one hour, her records were reviewed and considered, and she completed the WMS-III Trail Making A and B, and the Folstein Mini-Mental Status Examination.  Upon mental status examination, Litman noted that Nelson

> spoke in a monotone with flat affect and little humor other than it being self-effacing. She had difficulty hearing this examiner and had him repeat his question to her a number of times. She appeared saddened and resigned to her situation. She appeared very compliant in the interview and testing.   Thus, she did not appear to be demonstrating malingering or a factitious disorder. . . . When asked about her current level of pain on a zero to ten scale, with zero being neutral, she stated it is a 6 today. Normally, it fluctuates between a 5 and a 6.  However, there are times it can go from a 10+ down to a 3.  This bright woman talked in a coherent and well thought out manner. . . . She received 28 out of 30 on the Mini-Mental State [sic] Examination. She was fully oriented.  She was able to repeat three numbers.  She was able to spell "WORLD" backwards.  She had one error with serial 7's and did this very slowly. She became anxious and commented "this is very embarrassing."  She remembered two of the three objects with the aforementioned interference.  She was able to do simple naming and repeat a tricky sentence.  She was able to execute a three-stage command with her left hand.  She was able to write a sentence and wrote, "I'm not stupid, I just don't remember things well!"  She was able to draw two intersecting pentagons.  She knew who the current president was.  She became anxious about trying to remember who the president was before him, before she remembered it was George Bush.  She knew the current news item of the protracted 2000 presidential elections.  She knew the states and Canadian Province that bordered Washington. She understood proverbs and had good abstracting abilities.  She knew what to do if she was the first person to see smoke and fire in a theatre.  Thus, she displays good judgment.  It appears that her condition is either stable or slowly eroding.

(Tr. 228).  From the psychological testing that was conducted, Litman found that Nelson had "deficits in auditory memory," "good visual memory," and "average abilities in retaining bits of essentially non-emotional[ ] information."  (Tr.  229-230).  He determined, from all aspects of his

assessment, that Nelson had "basic abilities to reason.  Her understanding of her situation is reasonably good.  She does have memory problems that focus on auditory reception.  It appears that she is able to sustain concentration and persistence as evidenced by her performance in this situation, although it appears that longer periods will result in her becoming tired.  Her social interactions appear to be dramatically reduced.  Her adaptive skills appear to be minimal given her situation." (Tr. 231).

On April 5, 2001, Nelson was seen by Dr. Joseph Marion as a new patient.  (Tr. 343-344). At that time, he noted her history of "major depressive disorder with fibromyalgia," and wrote that "overall is feeling better, taking Wellbutrin, usually 50 mg a day, and Prozac 10 mg two q.d.," "sleeping well," but has a "productive cough for the past week and a half and nasal congestion."  (Tr. 343).  Upon examination, Nelson was "Alert, well.  Tired.  Nasal tone to her voice.  Pharynx well hydrated.  Nasal passages are very congested.  Neck nontender.  Lungs have bilateral wheezes and rhonchi."  Dr. Marion diagnosed Nelson with fibromyalgia, depression, obesity, and bronchitis.  For the bronchitis, he prescribed amoxicillin.  (Tr. 343-344).

On May 10, 2001, Nelson saw Dr. Kip Kemple, at "Physicians Rheumatology" "for an updated summary and review of her musculoskeletal and complex related medical problems.  (Tr. 252-253).  While no current objective findings were made at that visit, Nelson's medical problems were summarized by Dr. Kemple as follows:

1)   Complex arthralgia/myalgia syndrome compatible with fibromyalgia and reactive myofascial pain.  This involves relatively widespread muscle and joint pain which has persisted with moderate to high level of severity in her neck and shoulder girdle as well as her low back region.  She has other focal problems as follows:

1.1)   Lumbar spondylosis with degenerative disc and facet joint disease. Plain x-rays and tomographic bone scan confirmed disc and facet

<div style="margin-left:2em">

joint irritation at several lower lumbar levels.

1.2)   Hand pain with component of degenerative CMC arthropathy, de Quervain's tenosynovitis, and question of low-grade interphalangeal synovitis.

2)   Sicca syndrome with abnormal serologic tests.  She had a low titer ANA at 1:40.  However, she had a higher titer of DNA binding antibodies (results enclosed).  She does not have clinical features of lupus but this test should probably be repeated, with more focused follow-up in the next 1-2 years.

3)   Chronic fatigue with component of sleep apnea but also central fatigue profile.

4)   Tinnitus and balance disturbance – probable endolymphatic hydrops component (? autoimmune contribution).

5)   Mixed pattern headaches with sinus contribution but also migraine and cervicogenic component.

6)   Recurrent rhinitis/sinusitis.

</div>

(Tr. 252-253).   According to Dr. Kemple, Nelson "has managed to get some benefit from a combination of Neurontin, cyclobenzaprine, Prozac, and ibuprofen."  (Tr. 253).

Nelson was next seen by Dr. Marion on June 5, 2001.  (Tr. 341-342).  At that visit, Nelson complained of pain throughout her body, with sharp, stabbing sensations, poor sleep, irritability and fatigue. Upon examination, Nelson was alert and "well appearing;" a sensory examination of her hands was normal, her grip strength was equal, and her radial pulses were intact.  (Tr. 341).  There was, however, tenderness with Finkelstein's maneuver on the left. (Tr. 341).   Dr. Marion reiterated his  diagnoses of fibromyalgia, depression, and obesity, and started Nelson on Restoril to help her sleep. (Tr. 341).        Ten days later, on June 15, 2001, Nelson was seen by Dr. Marion at a follow-up appointment.  (Tr. 339-340).  At that time, Nelson reported that she had an "exacerbation of pain in her lower back which began about one week ago," that had only slightly improved. (Tr. 339).  Her last such exacerbation had been 5-6 months ago.  (Tr. 339).  There was no weakness, bowel or

bladder symptoms associated with the back pain.  (Tr. 339).  As for her sleeping problems, Nelson reported that she was "[s]till not sleeping well because of the fibromyalgia, and has not found lorazepam to be of any benefit.  Temazepam did not seem to help much either.  Is taking 1-2 Percocet a day, which gives her some relief."  (Tr. 339).  Upon examination, Dr. Marion found Nelson "Alert.  She appears well, but depressed.  She can change positions, but stands very slowly because of discomfort in her back.  Her back shows no list.  She can flex to about 70 degrees, returns to zero very slowly.  She can extend to 10.  She can rotate and laterally bend only limited [sic] and with discomfort.  She has palpable pain across the sacroiliac joints bilaterally, but the right side greater than the left side, and there is tenderness in the sciatic notch on the right side.  We did not do straight leg raise testing.  She  has normal sensory examination, and she does have intact strength in muscle groups of her lower extremities."  (Tr. 339).   Dr. Marion diagnosed Nelson with "[r]ecurring low back pain with current exacerbations, likely musculoskeletal," and  "[f]ibromyalgia syndrome."  (Tr. 339).  He noted that Nelson could "increase the lorazepam to 1 mg at bedtime" to help with her poor sleep, "[c]ontinue b.i.d. dose of Percocet" and "start physical therapy."  (Tr. 340).

At her next follow-up visit with Dr. Marion on July 17, 2001, Nelson reported that overall her back pain had improved.  (Tr. 336).  She was, however, "continuing to have ongoing problems with total body aches and chronic fatigue."  (Tr. 336).  Her sleeping had "improved slightly."  (Tr. 336).  She inquired about "changing medications or at least discontinuing medications."  (Tr. 336). Her current medications included Lorazepam, Endocet and Flexeril, as needed; and Wellbutrin and Prometrium daily.  Objectively, Dr. Marion found Nelson alert and overweight, with a "flat affect." (Tr. 336). Her thought content was appropriate, and her mood did not appear to be depressed, but she "was not well animated" either.  (Tr. 336).  Dr. Marion started Nelson on "trazodone at 25 mg

at bedtime." He also referred her to physiatry "to further discuss her fibromyalgia symptoms." Dr. Marion also noted that Nelson was "seeking disability and may be eligible for this. She is to continue to be as active as possible. Exercise as often as possible as well. Return to see me routinely." (Tr. 336).

Nelson was next seen by Dr. Marion on September 18, 2001, complaining of "recurrence of panic attacks which she has had in the past." (Tr. 334-335). Dr. Nelson found Nelson alert and well. She was using a cane "for assistance to help with her balance and with her walking. She is calm, alert and in no distress today. She does not appear anxious." (Tr. 334). Dr. Marion diagnosed Nelson with panic attacks and gait disturbance secondary to fatigue. (Tr. 334). He prescribed Xanax .5 mg, three to four times as day, as needed, for the panic attacks. (Tr. 334).

At her next follow-up appointment, on October 10, 2001, Nelson reported "having less frequency of anxiety and panic attacks in the evenings. Sleep is improved. Still overall does not feel well. States that she has chronic pain, feels that her whole body is one big ache. There is decreased energy. She feels that she cannot carry out even simple activities during the day because of chronic fatigue. She is asking about going on total disability. She feels that she cannot carry out functions at work and has been off work for now." (Tr. 332). Upon examination, Dr. Marion found Nelson to be depressed-appearing with a flat affect. (Tr. 332). He diagnosed her with depression, chronic fatigue with fibromyalgia, and a history of sleep apnea. (Tr. 332). He referred her to occupational health for "input into her abilities and disabilities," noting that he "certainly [is] not a disability physician." (Tr. 332).

At her last visit with Dr. Marion on October 23, 2001, Nelson reported that she was "working towards Social Security Disability." In the "subjective" portion of his assessment, Dr. Marion wrote

16

that Nelson "continues to have issues with fibromyalgia, chronic fatigue, depression.  She is markedly limited in her mobility because of chronic discomfort in her joints of her lower extremities." (Tr. 330).  While Dr. Marion found her alert and well, a formal examination was not conducted. (Tr. 330).  Dr. Marion repeated his earlier diagnoses of chronic fatigue, fibromyalgia, depression and obesity. (Tr. 330).

On February 5, 2002, Laurence M. Binder, Ph.D, conducted a neuropsychological evaluation of Nelson, at the request of Dr. Kenneth Meigs.[4]  (Tr. 360-363).  In the history section of the evaluation, Dr. Binder recorded Nelson's complaints of fibromyalgia, low back pain, restless leg syndrome, dizziness diagnosed as labyrinthitis, stomach pain, chronic pain, long-standing depression, and occasional panic attacks. (Tr. 360).  He also recorded Nelson's reports of "memory and concentration problems. She finds herself writing a lot of notes, and she has to concentrate really hard.  She has other mental health symptoms including sadness most of the time." (Tr. 360).  A series of tests was given to Nelson, including Memory for 15 Items, Test of Memory Malingering, Logical Memory, Hopkins Verbal Learning Test Revised, Brief Visuospatial Memory Test Revised, Continuous Visual Memory Test, Digit Vigilance, Trail Making, WAIS-III, Grooved Pegboard, Wisconsin Card Sorting Test, Wide Range Achievement Test-3 (WRAT-3) Reading, and SCL-90-R. (Tr. 361).   In the Test Results section of his evaluation, Dr. Binder wrote that Nelson "failed both of the validity tests, and so the evaluation results overall were invalid." (Tr. 362).  While Dr. Binder went on to discuss the test results, he ultimately concluded that "[t]he cognitive testing was invalid because she was unable or possibly unwilling to produce her best effort." (Tr. 362-363).   In all, Dr.

---

[4] Other than this evaluation being requested by Dr. Kenneth Meigs, and Nelson's attorney referring to Kenneth Meigs, Jr., D.O., as Nelson's treating physician (Tr. 358), there are no medical records from Dr. Meigs, and no additional references to Dr. Meigs in the administrative record.

Binder noted that the only "conclusion to be drawn is that this evaluation did not determine whether or not there is objective evidence of a memory problem because of the poor effort." (Tr. 363).

On or about February 27, 2002, Nelson started seeing Dr. Ray Abbassian, at the Columbia Family Medical Associates in Portland, Oregon. (Tr. 355). While there is no office note dated February 27, 2002, there is one un-dated note, and notes from March 2, 2002, and April 8, 2002, all of which are barely legible, from Dr. Abbassian's office. (Tr. 351-354). In a "To Whom it May Concern" letter, dated April 10, 2002, however, Dr. Abbassian summarized Nelson's prior diagnoses, and then discussed his current assessment of Nelson as follows:

> As I see her in my clinic, she is able to care for herself and quite articulate and has minimal body complaints that are manifested in signs of physical exam. She has tender spots to palpation about her trapezius, cervical paravertebrals and thoracic paravertebrals as well. Overall, aside from the fact that she is overweight, she has a very normal exam.
>
> My conclusions so far is that she does have sicca syndrome, fibromyalgia, clinical hypothyroid and I cannot assess at this time how significant her symptoms will resolve on replacement as she just began that at our second to the last visit. I also think that her degenerative disk and facet joint disease are obvious but her instances of lupus are not obvious to me. She does have hyperlipidemia which may be related to her thyroid, and she has been exercising on a daily basis on her treadmill and been losing weight since July, about 30 pounds over that time period to the present.

(Tr. 355-356). Following that letter, and an MRI which revealed a few small areas of abnormal signal intensity in the subcortical white matter (Tr. 357), Dr. Abbassian referred Nelson to Dr. J. Bruce Bell, for a neurological evaluation to determine whether Nelson could have MS. That neurological evaluation was conducted on April 24, 2002. (Tr. 364-366). At that time, Dr. Bell noted Nelson's complaints of "fatigue, night sweats, trouble sleeping, [ ] chronic sinusitis, some ringing in her ears, trouble hearing, nosebleeds, soreness of her mouth, intermittent coughing, a history of irregular heartbeat, ulcers, diarrhea, heartburn, chronic thyroid problems, headache,

dizziness, and some occasional bladder incontinence." (Tr. 365). Nelson's neurologic examination was normal: Nelson was alert, oriented, and cooperative; there was no gross impairment of mental status; there was no evidence of wasting, weakness, atrophy or fasciculations; there was good muscle tone; resistance to passive stress was normal; pin, touch, vibration and cortical modalities were intact; finger-to-nose and heel-to-knee-to shin were accurately performed; her gait was normal, as was her tandem walking; and her reflexes were essentially normal. (Tr. 365-366). From his neurologic examination and his review of her MRI, Dr. Bell doubted that she had multiple sclerosis, but stated that he could not definitively rule it out without further testing. (Tr. 366). Another neurological evaluation, conducted by Dr. Kirk L. Weller on June 12, 2002 (Tr. 368-373), yielded substantially similar results (Tr. 371-372), with Dr. Weller opining that Nelson likely did not have MS, and that her symptoms were more indicative of fibromyalgia: "Her symptoms rather better fit into a syndrome according to commonly available descriptions of fibromyalgia. Her total body pain, her tendency to have fatigue and her depression are features which figure predominantly with fibromyalgia, and I think that is an organizing diagnostic consideration that is more helpful." (Tr. 372).

Nelson was next evaluated on July 1, 2003, over a year later, by Dr. Vivian Blanco at Blanco Family Medicine. (Tr. 476-478). At the outset it was noted that "[s]he is here for insurance/disability paperwork." (Tr. 476). Based on her reported symptoms and her prior diagnostic tests and diagnoses, Dr. Blanco diagnosed Nelson with chronic fatigue syndrome and fibromyalgia. In so doing, Dr. Blanco wrote:

**Chronic fatigue syndrome**
Prior record reviewed. Considering she has had such a significant prior workup, no further tests will be ordered today. Had a long discussion with the patient regarding the fact that she meets criteria for Chronic Fatigue Syndrome due to the fact that

other diagnoses have been ruled out and that she has the following symptoms:
- impaired memory and concentration
- sore throat
- muscle pain
- multijoint pain
- unrefreshing sleep
- headaches
- postexertional malaise

&ast; &ast; &ast;

**Fibromyalgia**
Patient also has fibromyalgia which is often a comorbid condition with chronic fatigue and depression.  She has failed multiple medications for both mood and sleep disorder.  She should continue her multiple complimentary alternative medicine modalities.

(Tr. 478).

Following that evaluation by Dr. Blanco, Nelson intermittently saw Dr. Abbassian for treatment through February 2005. (Tr. 480-487).

The objective medical evidence in the record, as set forth above, does not support the conclusion that Nelson is unable to engage in any type of gainful activity.  Most of the objective medical findings were normal, and those that were not, were not so significant so as to support the conclusion that Nelson was incapable of performing the type of work identified by the ALJ.  As such, the objective medical evidence factor supports the ALJ's decision.

**B.     Diagnosis and Expert Opinions**

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight." *Perez v. Schweiker,* 653 F.2d 997, 1001 (5th Cir. 1981); *see also Newton v. Apfel*, 209 F.3d 448, 455

(5th Cir. 2000) ("The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses should be accorded great weight in determining disability."). In addition, a specialist's opinion is generally to be accorded more weight than a non-specialist's opinion. *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Further, regardless of the opinions and diagnoses and medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).

The administrative record contains the opinion of Dr. Joseph Marion as to Nelson's ability to perform work related activities, the allegedly corroborating opinions of Dr. Blanco and Dr. Litman, and the contradicting opinions of Drs. Peterson and Hoskins, who reviewed Nelson's medical records and completed a psychiatric review technique form (Tr. 232-245), and a physical residual functional capacity assessment form (Tr. 246-251), respectively. With respect to the opinion of Dr. Marion, which opinion forms, in large part, the basis of this appeal, that opinion is contained in a "Fibromyalgia Residual Functional Capacity Questionnaire" Dr. Marion completed on October 23, 2001. (Tr. 260-264). In that "Fibromyalgia Residual Functional Capacity Questionnaire," Dr. Marion checked that Nelson met the American College of Rheumatology criteria for fibromyalgia, noted her other diagnoses of depression and obesity, and assessed her prognosis as "fair." (Tr. 260). He identified the clinical findings that supported his diagnosis of fibromyalgia as "clinically has trigger points, chronic fatigue" and checked the following as Nelson's symptoms: multiple tender

points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, irritable bowel syndrome, frequent, severe headaches, numbness and tingling, sicca symptoms, dysmenorrhea, anxiety, panic attacks, depression, premenstrual syndrome, temporomandibular joint dysfunction, carpal tunnel syndrome, and chronic fatigue syndrome. (Tr. 260-261).  Dr. Marion then opined, through his Questionnaire responses, that Nelson would frequently experience "pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks," that she was "incapable of even 'low stress' jobs," and that she can walk only 1 ½ to 2 city blocks without rest or severe pain.   (Tr. 261-262).   Somewhat similarly, and cited as corroboration for Dr. Marion's opinion, is the opinion of Dr. Blanco, who wrote in her one-time evaluation of Nelson, "It is unclear why disability has been denied to this patient in the past, since she is clearly unable to work due to the severity of her symptoms." (Tr. 478).  Additionally there are the findings and opinions of Dr. Litman, also cited by Nelson as corroborative of the opinion of Dr. Marion, that she has auditory memory problems, cannot maintain concentration and persistence for more than an hour, and has a GAF of 45 (Tr. 225-231), which is indicative of  serious symptoms and/or serious impairments in social, occupational, or school functioning.[5]  Nelson maintains, in the two issues raised in this appeal, that the ALJ did not fully consider the evaluation, findings and

---

[5]  The Global Assessment of Functioning ("GAF") is a measurement "with respect only to psychological, social and occupational functioning." *Boyd v. Apfel*, 239 F.3d 698, 708 (5th Cir. 2001) (citing DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 4th Edition (DSM-IV), at 32).  A GAF of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 4th Edition, Text Revision (DSM-IV-TR), at 34.  A GAF of 41-50 denotes "serious symptoms (e.g., suicidal ideation, severe obsessive rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

conclusions of Dr. Litman, and did not give proper weight and/or deference to the opinion of Dr. Marion.

The record shows that the ALJ did consider and address the findings and conclusions of Dr. Litman, but did so briefly: "Consultative psychological examination performed by Jack Litman, Ph.D., in December 2000 revealed she had memory problems, which focused on auditory reception, but testing at that time showed that she was able to sustain concentration and persistence. (Exhibit 5F)." (Tr. 545). The ALJ's brief discussion of Dr. Litman's findings and conclusions was not error and does not equate to a failure to consider all the evidence in the record.  As set forth above, Dr. Litman, in his Memory Assessment of Nelson, found that while she has auditory memory problems, her visual memory is good, she has an average ability to retain bits of essentially non-emotional information, she has basic abilities to reason, and was able to maintain sufficient concentration and persistence throughout the evaluation.  (Tr. 230).  In addition, while Dr. Litman did diagnose Nelson with a dysthymic disorder, and he did assess her with a GAF of 45, he also specifically noted that Nelson had "not been treated for this [depression] other than with intermittent psychotropic medications." (Tr. 231).   Finally, Dr. Litman did not state or indicate that Nelson was only able to maintain concentration and persistence for an hour.  His evaluation states that the interview part took approximately one hour. (Tr. 225); No mention is made of how long the entire evaluation took. Nelson's argument, based on Dr. Litman's assessment, that she can only maintain concentration and persistence for an hour, is not supported by the record or anything in Dr. Litman's evaluation/report.

As for the ALJ's consideration of Dr. Marion's opinion, the ALJ explained in detail why she did not fully credit Dr. Marion's opinion(s):

> Consistent with SSR 96-2p and the remand order of the District Court, the
> undersigned has considered the treating source opinions of Dr. Marion and Dr.

Blanco that the claimant is unable to work.  (Exhibits 18E, 10F, 22F).  While Dr. Marion (Exhibit 10F) had [a] treating relationship with the claimant, the treatment history was quite brief (from April 2001 to October 2001).  It does not appear that the doctor saw the claimant after October; therefore, his opinion was based on a very short treatment period (6 months) during which she reported improvement in her symptoms.  (Exhibit 15F).  Upon examination of the claimant Dr. Marion reported that objectively, she was alert and "well appearing", her hands had normal sensory examination, her grip strength was equal, and radial pulses were intact.  At the claimant's last visit, Dr. Marion advised the claimant to "continue to be as active as possible" and "exercise as often as possible."  (Exhibit 15F/7).  Said objective findings and advice clearly does not support the claimant's allegation of having pain to the degree that she was lying down 75-80% of her time and unable to engage in sitting, walking, and standing.  Also, Dr. Marion's opinion primarily related to the claimant's mental limitations; the doctor did not give any physical limitations except for limitation against walking more than 1 ½ - 2 blocks at a time.  The doctor's opinion appears to rest at least in part on an assessment of a mental impairment outside the doctor's area of expertise.  Dr. Martin's opinion is not supported by his own objective findings and is inconsistent with other substantial findings of record; therefore, it is found less persuasive and is not afforded controlling weight.  (SSR 96-2p).

The undersigned also affords no weight to the opinion of Dr. Blanco that the claimant "is clearly unable to work" (Exhibits 22F/3, 18E).  The claimant was seen once by Dr. Blanco for "insurance/disability paperwork"; therefore, the claimant did not have a treating relationship with the doctor.  (Exhibit 22F/1).  Examination by Dr. Blanco revealed 16/18 fibromyalgia trigger points, but no other significant physical or neurological findings.  Dr. Blanco['s] diagnosis of CFS was based on a review of her prior records and the claimant's reported symptoms.  Dr. Blanco was not a treating doctor and thus, her opinion is not entitled to controlling weight.  (SSR 96-2p).  Nonetheless, the opinion must be considered and afforded appropriate weight.  Dr. Blanco's opinion was based on a single visit with the claimant and on minimal examination[,] objective findings[, or] pathology and, is not supported by the record as a whole.

The Social Security Regulations provide a framework for the consideration of expert medical opinions of a claimant's treating physician.  Under 20 C.F.R. § 404.1527(d)(2), consideration of a treating physician's opinion must be based on:

(1)     the physician's length of treatment of the claimant,;

(2)     the physician's frequency of examination,

(3)     the nature and extent of the treatment relationship,

(4)     the support of the physician's opinion afforded by the medical evidence of
        record,

(5)     the consistency of the opinion with the record as a whole; and

(6)     the specialization of the treating physician.

*Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000).  While opinions of treating physicians need not

be accorded controlling weight on the issue of disability, in most cases such opinions must at least

be given considerable deference.  Social Security Rule 96-2p provides in this regard:

> [A] finding that a treating source medical opinion is not well supported by medically
> acceptable clinical and laboratory diagnostic techniques or is inconsistent with the
> other substantial evidence in the case record only means that the opinion is not
> entitled to "controlling weight," not that the opinion should be rejected.  Treating
> source medical opinions are still entitled to deference and must be weighed using all
> of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating
> sources's medical opinion will be entitled to the greatest weight and should be
> adopted, even if it does not meet the test for controlling weight.

Social Security Ruling (SSR) 96-2p, 61 Fed. Reg. 34490 (July 2, 1996).  In this Circuit, as in most

others, before a medical opinion of a treating physician can be rejected, the ALJ must consider and

weigh the six factors set forth in 20 C.F.R. § 404.1527(d).  *Newton*, 209 F.3d at 456.   In the end,

however, it is the ALJ who "has sole responsibility for determining a claimant's disability status.'"

*Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995).

Here, as explained by the ALJ, Dr. Blanco was not a treating physician.  That determination

is supported by the record which shows that Nelson saw Dr. Blanco on only one occasion, for

"insurance/disability paperwork."  While Dr. Marion clearly was Nelson's treating physician, the

ALJ explained why Dr. Marion's opinion as to Nelson's ability to engage in work related activities

was not given controlling weight.  In accord with 20 C.F.R. § 404.1527(d)(2) and *Newton*, the ALJ

discussed the length of the treating relationship, the frequency of Nelson's visits, the nature of the treating relationship, the medical evidence that was inconsistent with Dr. Marion's opinion, the lack of support in the medical evidence for his opinion, and the fact that he had no expertise in mental health issues.

As for Nelson's argument that the ALJ erred in considering Dr. Marion's opinion as "primarily related to [Nelson's] mental limitations," Plaintiff's Response to Defendant's Motion for Summary Judgment (Document No. 13) at 23, that argument disregards the ALJ's specific determination that Dr. Marion's "opinion appears to rest *at least in part* on an assessment of a mental impairment outside the doctor's area of expertise." (Tr. 547, emphasis added).  The argument also disregards the fact that Dr. Marion did not complete the "Fibromyalgia Residual Functional Capacity Questionnaire," answering only the question about Nelson's ability to walk, and leaving blank all the other questions about Nelson's *physical* limitations or restrictions.  (Tr. 260-264).

Because the ALJ sufficiently considered the findings and conclusions of Dr. Litman, considered and addressed  the opinion of Dr. Marion within the framework provided by SSR 96-2P and *Newton*, and considered and discounted the unsupported opinion of Dr. Blanco, a non-treating physician, the ALJ did not err in her consideration of the expert medical opinions in the record.  This factor therefore also weighs in favor of the ALJ's decision.

## C.    Subjective Evidence of Pain and Disability

The third element considered is the subjective evidence of pain and disability, including the claimant's testimony and corroboration by family and friends.  Not all pain and subjective symptoms are disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled.  *Cook,* 750 F.2d at 395.   In an appeal of a denial of benefits, the Act requires

this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has the opportunity to observe the claimant. *Hames v. Heckler,* 707 F.2d 162, 166 (5th Cir. 1983).

Nelson testified at the hearing on July 10, 2009, that her pain and fatigue are inseparable and that both conditions got progressively worse, before they leveled out.  (Tr. 629, 631).  Nelson could not provide any dates (even by year) when her conditions worsened or when they leveled out, but she did testify that by April 1, 2000, her pain and fatigue were interfering with her ability to work, her memory, and her ability to stay "on-task."  (Tr. 632-633).  According to Nelson, during that time she could only concentrate for 5 minutes at a time, and that after she stopped working she would lie around, resting, for close to "80 percent" of the day.  (Tr. 634).  Any type of stress seemed to exacerbate her condition.  (Tr. 634-635).  Without identifying any dates, Nelson testified that any type of physical movement, including going up and down the stairs at her house, any type of housekeeping, or doing the laundry, would exacerbate her pain and fatigue.  (Tr. 635-636).

The ALJ found Nelson's testimony and her subjective complaints about her disabling pain and fatigue between April 1, 2000, and November 10, 2004, not fully credible.  In doing so, the ALJ wrote:

> At the hearing, the claimant testified that she stopped working due to mental limitations such as inability to concentrate and remember.  Her conditions of fibromyalgia and CFS progressively worsened over time; her pain ultimately reached a baseline, but she does not recall when it reached that point.  Because of pain she had problems sitting, walking, standing, and lifting.  Her condition worsened that by April 2000 she was lying down 75-80% of the day and only got up to feed her dog and use the bathroom.  Physical exertion, fatigue and stress exacerbated her conditions to the degree that washing 2 loads of laundry took all day.  She used a cane to help with walking and balance, but does not remember when the use of a cane was prescribed by her doctor.  She was treated for a thyroid condition on one occasion; said treatment was successful, but she has continued to take medication for the condition.  The thyroid impairment is at times exacerbated, [but] primarily

remains stable.  She has not required psychiatric hospitalization and currently weighs 250 pounds.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The claimant asserts that she stopped working because she was unable to concentrate or remember.  Notwithstanding the claimant's feigned memory problems, she was able to recall many details of not being able to remember things before she stopped working.  For example, she remembered doing laundry and not being able to concentrate for more than 5 minutes at a time and that she spent 75-80% of her time lying down.  Consultative psychological examination performed by Jack Litman, Ph.D., in December 2000 revealed she had memory problems, which focused on auditory reception, but testing at that time showed that she was able to sustain concentration and persistence.  (Exhibit 5F).  Also, as discussed below, she had activities of daily living that clearly contradict her allegation of having memory and concentration problems to the extent that she is disabled under the Social Security Act.

The claimant asserts that [she] has disabling pain and fatigue.  Indeed, she has conditions that can cause pain symptomology and fatigue.  However, treatment for the allegedly disabling impairments has been essentially routine and/or conservative in nature.  Her treatment plan has primarily consisted of medications, alternative medical therapies, i.e., herbs and spiritual healing (Exhibit 22F/1), and a brief period of physical therapy.  Despite her persistent complaints of muscle and joint pain, examinations by her doctors have essentially been within normal limits. Neurological examinations have also been normal and x-rays of the lumbar spine and hips revealed normal findings.  (Exhibits 4F, 13F/4-5, 15F/7, 17F/1-3, 19F, 20F/5, 23F/2-5).  The claimant has had extensive workup, but her subjective complaints of pain and limitations are not supported by the objective evidence of record.  It is further noted that the record reflects significant gaps in the claimant's history of treatment.  The evidence shows that claimant was treated from 1995 to 1997 for chronic muscle and joint pain related to a diagnosis of fibromyalgia (Exhibit 1F). She was last seen by Dr, Bonafede in January 1997 and despite a recommended follow up in 6 weeks, the claimant did not return (Exhibit 2F/2).  The record indicates no treatment evidence from that time until she presented to Dr. Johansen in June 2000, a date following her alleged onset date of disability.  The claimant's allegedly disabling impairments were present at approximately the same level of severity prior to the alleged onset date.  Evidence indicating that the claimant was not treated from February 1997 to May 2000 and the fact that the impairments did not prevent the claimant from working at that time strongly suggest that it would not

currently prevent work.

Additionally, the claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.  She operated two businesses within the relevant period.  She went on walks and to doctors' appointments frequently.  She attended Weight Watchers meetings as well as fibromyalgia support group meetings.  She cooked, did laundry, cared for her dogs, and did housework.  She occasionally went to the movies and took vacations.  Her ability engage in aid activities show[s] that she may have limitations, but not to the degree that she alleges that she is precluded for all work-related activities.

(Tr. 545-546).

Credibility determinations, such as that made by the ALJ in this case in connection with Nelson's subjective complaints, are generally within the province of the ALJ to make.  *See Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) ("In sum, the ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'") (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)), *cert. denied*, 514 U.S. 1120 (1995).  Here, the ALJ supported her credibility determination with references to the medical evidence and the testimony about Nelson's activities.  Accordingly, this factor also supports the ALJ's decision.

### D.  Education, Work History and Age

The fourth element considered is the claimant's educational background, work history and present age.  A claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(a).

Here, during the time period under consideration (from April 1, 2000 through November 10, 2004), Nelson was 45-49 years old, she had a college education, and had past relevant work as a

human resources administrator, a personnel clerk, an administrative clerk, and a roller rink manager. After having determined that Nelson could engage in a limited range of light work, "with mild to moderate symptomology," with the "the residual functional capacity to: lift and carry up to 20 pounds occasionally; lift and carry up to 10 pounds frequently; sit without limitation (with normal morning and afternoon 15-minute breaks and a lunch break) except she must have a sit stand option throughout an 8-hour work day; and perform work that does not require working with the public and complex and varied work instructions. [She] is capable of performing simple repetitive work tasks on a sustained basis without normal morning and afternoon 15-minute breaks and a lunch break," the ALJ questioned a vocational expert regarding jobs that Nelson could perform. The vocational expert testified that a person of Nelson's age, education and work history, with the RFC found by the ALJ, would be able to do work as a office helper, mail clerk, and photocopier. (Tr. 638-641).

"A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

Here, the ALJ relied on a comprehensive hypothetical question to the vocational expert, which incorporated all the impairments the ALJ found supported by the record. In response to that hypothetical, the vocational expert identified jobs existing in significant numbers in the local and national economy that Nelson could perform. Given the ALJ's RFC determination, which is

supported by substantial evidence in the record, and the ALJ's hypothetical question(s) to the vocational expert and the vocational expert's responses thereto, the education, age and work history factor also supports the ALJ's decision.

## VI.  Conclusion and Order

Based on the foregoing, the substantial evidence that supports the ALJ's November 20, 2009, decision, and the ALJ's full and proper consideration of the opinions of Nelson's physicians, it is

ORDERED that Defendant's Motion for Summary Judgment (Document No. 10) is GRANTED, Plaintiff's cross Motion for Summary Judgment (Document No. 13) is DENIED, and the decision of the Commissioner is AFFIRMED.

Signed at Houston, Texas, this 11th day of September, 2013.

Frances H. Stacy
United States Magistrate Judge